SIGNED.

Dated: June 2, 2011

_____
**Randolph J. Haines, Bankruptcy Judge**

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re<br><br>RED MOUNTAIN MACHINERY COMPANY;<br>RED MOUNTAIN HOLDINGS, LLC;<br>RED MOUNTAIN PACIFIC LLC, and<br>BTH, LLC,<br><br>                Debtors. | Chapter 11<br><br>CASE NO. 2:09-bk-19166-RJH<br>(Substantively Consolidated)<br><br>OPINION AND ORDER DENYING<br>STAY PENDING APPEAL |

Secured creditor Comerica Bank has appealed the Order confirming the Debtor's First Amended Plan of Reorganization, and has moved for a stay pending appeal pursuant to Bankruptcy Rule 8005. The Court granted Comerica an emergency hearing on its motion, and the Debtor has objected to the stay pending appeal. After consideration of the memoranda and oral arguments, the Court denies the stay pending appeal.

**Legal Standard for Stay Pending Appeal**

It appears that even after the Supreme Court's opinion in *Nken*,[1] the Ninth Circuit essentially adheres to its "sliding scale" balancing of the traditional four factors:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits;
> (2) whether the applicant will be irreparably injured absent a stay;
> (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and
> (4) where the public interest lies.[2]

---

[1] *Nken v. Holder*, 129 S. Ct. 1749 (2009).

[2] *Leiva-Perez v. Holder*, No. 09-71636, 2011 WL 1204334, at *2 (9th Cir. April 1, 2011). Although *Nken* and *Leiva-Perez* were decided under the statute permitting courts of appeal to stay an order for removal of an alien, 8 U.S.C. § 1252(b)(3)(B) (2006), courts in the Ninth Circuit apply the same standards to motions for preliminary injunctive relief, *Abbassi v. INS*, 143 F.3d 513 (9th Cir.

The "sliding scale" or "continuum" aspect of this balancing requires a stronger showing of likelihood of success on appeal if there is a weaker showing of likelihood of irreparable injury.[3] Thus while the "strong showing" of likely success on the appeal need not require a demonstration that the appellant is more likely than not to win on the merits[4] if the probability of irreparable injury is high, the mere "reasonable probability" of success on appeal or the raising of a "serious legal question" do not suffice if the likelihood of irreparable injury is not high or the balance of hardships does not tip sharply in the appellant's favor.[5]

But both the Supreme Court and the Ninth Circuit have raised the bar on the showing of irreparable injury, now requiring a showing that "an irreparable injury is the more probable or likely outcome" if the stay is not granted,[6] and have noted that the trial court "is in a much better position to predict the likelihood of harm than the likelihood of success."[7]

---

1998), and to stays pending appeal under Bankruptcy Rule 8005, *In re Dexter Distributing Corp.*, No. CV09-1099-PHX-JAT, 2009 WL 2154538, at *2 (D. Ariz. July 14, 2009).

[3] *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) ("a stronger showing of one element may offset a weaker showing of another," so that an injunction could issue based on mere showing that "serious questions going to the merits were raised and the balance of hardships tips sharply in [plaintiff's] favor," citing *Clear Channel Outdoor, Inc. v. City of Los Angeles*, 340 F.3d 810, 813 (9th Cir. 2003)).

[4] *Leiva-Perez*, 2011 WL 124334, at *4.

[5] "At one end of the continuum, the moving party is required to show both a probability of success on the merits and the possibility of irreparable injury. . . . At the other end of the continuum, the moving party must demonstrate that serious legal questions are raised and that the balance of hardships tips sharply in its favor." *Lopez v. Heckler,* 713 F.2d 1432, 1435 (9th Cir. 1983), *rev'd in part on other grounds*, 463 U.S. 1328 (1983). *Accord, In re First S. Sav. Ass'n*, 820 F.2d 700, 704 (5th Cir. 1987) ("the movant need only present a substantial case on the merits when a serious legal question is involved and show that the balance of the equities weighs heavily in favor of granting the stay"); *In re Pac. Gas and Elec. Co.*, No. C-02-1550-VRW, 2002 WL 32071634, at *2 (N.D. Cal. Nov. 14, 2002) ("or, in an alternative formulation of the same standard, serious legal questions and a balance of hardships were the stay denied"); *WCI Cable, Inc. v. Alaska R.R. Corp.,* 285 B.R. 476, 478 (D. Or. 2002) ("At the other end of the continuum, the moving party must demonstrate that serious legal questions are raised and that the balance of hardships tips sharply in its favor," citing *Lopez v. Heckler*).

[6] *Leiva-Perez*, 2011 WL 124334, at *5.

[7] *Id.* at *6 (quoting *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1139 (9th Cir. 2011) (Mosman, D.J., *concurring*)).

**Factual and Procedural Background**

The Debtor is an Arizona corporation formed in 1986 by Owen and Linda Cowing, who are the Debtor's only shareholders. The Debtor's business consists of the rental of large earth moving equipment, primarily Caterpillars often referred to as "yellow iron," almost exclusively to licensed contractors.

The Debtor's business model is to purchase and rent out older, used equipment but to maintain it extremely well according to regular maintenance schedules. In addition, the Debtor has maintenance staff that can respond quickly if a machine breaks down on the job, either to repair it or to substitute replacement equipment. Over the past quarter century the Debtor has built a reputation for reliability and minimal downtime, and because it does not buy or use new equipment it can charge lower rental rates than its principal competitor.

By 2001, the Debtor had expanded its operations both into southern California and southern Nevada, owned more than 300 machines, employed more than 140 people, and produced annual gross revenues in excess of $43 million. As a result of the economic downturn beginning in 2007, however, its annual revenues declined to $10 million for 2008.

Since 2003, the Debtor has been financed by a revolving line of credit with Comerica Bank. By the time the Chapter 11 was filed in August, 2009, the Comerica debt was approximately $33 million. The debt is guaranteed by Owen and Linda Cowing.

In the spring of 2008, the decline in revenues caused non-monetary defaults in the Comerica debt, which led to a series of forbearance agreements and workout negotiations. At about that same time Owen Cowing was diagnosed with leukemia, and therefore turned over primary responsibility for the workout negotiations to the Debtor's then-Chief Financial Officer Darren Dierich. Dierich continually advised that no workout solution could be negotiated with Comerica, and that Comerica insisted that the Debtor wind down its business operations, substantially reduce the amount of equipment it owned, and that it prepare for liquidation.

The Debtor contends that in June, 2009, Owen Cowing discovered that Comerica had published a notice of the UCC sale of the Debtor's business. Subsequently, he discovered secret e-mails between Comerica and his CFO Dierich that revealed a plan for Comerica to sell

the Debtor's assets to an entity owned and controlled by Dierich, with the purchase to be financed by Comerica, so that Dierich could take over the Debtor's business for his own benefit. Comerica and Dierich had agreed to keep their plan secret from the Cowings, according to the Debtor.

In June, 2009, the Debtor advised Comerica of its discovery of the secret sale plan and that it might have claims against Comerica as a result. In August, 2009, Comerica advised that it would not approve payment of any weekly expenses, including payroll, that had routinely been paid out of Comerica's revolving line. Because it could not fund payroll or pay trade vendors, the Debtor filed this Chapter 11 petition on August 11, 2009.

Although the Debtor had been downsizing in 2007 and 2008, by the petition date it owned approximately 180 items of major equipment. About two months after the filing, the Debtor received a bid from an auction company to purchase approximately 50% of the Debtor's equipment for a little over $5 million. After initially opposing the sale, Comerica eventually consented to the sale and made a credit bid of $7 million for the equipment. After the sale, the Debtor's remaining equipment was approximately 83 pieces of major equipment along with approximately 50 attachments and tools.

The Debtor filed its plan of reorganization in December, 2009, and filed its first amended plan in October, 2010. In November, Comerica filed an election pursuant to Bankruptcy Code § 1111(b), seeking to have its approximate $25 million claim treated as fully secured. The Debtor objected pursuant to Code § 1111(b)(1)(B)(II), arguing that the § 1111(b) election is not available when the property has been sold under § 363. The parties briefed and argued the issues of whether the Code's language "is sold" may include a sale prior to confirmation and how the exception to the election applies when only some of "such property is sold." The Court concluded that "is sold" includes sales made prior to the election deadline, because "or is to be sold under the plan" refers to sales to be made after the election deadline. The Court also held that when there is a sale of only a portion of the property there must be a pro rata exclusion from the election. Pursuant to that ruling, for purposes of confirmation the parties stipulated that the value of Comerica's collateral is $10 million, and that Comerica's

4

total secured claim pursuant to § 1111(b) is $15.9 million (based on the $5.9 million deficiency pertaining to the collateral that was not sold). They also stipulated that Comerica had an unsecured claim of $9.8 million, based on the deficiency pertaining to the collateral that was sold and the Court's determination that it could not make the § 1111(b) election as to such collateral.

The plan classifies Comerica's $15.9 million allowed secured § 1111(b) claim in Class 2. Pursuant to § 1129(b)(2)(A)(i)(II), although the principal amount of the claim is $15.9 million it need be paid only a present value of $10 million. The allowed secured claim will be paid with interest on $10 million at 6.5%, the rate the Court determined necessary to provide present value. For the first year it will be paid in 12 monthly interest-only payments, and thereafter will be paid semiannual principal and interest payments based on a 20 year amortization, with the full balance due in 15 years.

The plan classifies Comerica's deficiency claim arising from the portion of its collateral that was sold, in the approximate amount of $9.8 million, in Class 7. All other unsecured claims, in the approximate amount of $4.5 million, are classified in Class 8. All 42 ballots cast in Class 8 accepted the plan. The allowed claims in Class 7 and 8 will share pro rata in a $100,000 pot to be funded on the effective date of the plan.

Both Comerica's secured and unsecured deficiency claims are treated as disputed claims under the plan. Until entry of a final order in the adversary proceeding, all payments due to Comerica on these claims will be deposited in a creditor reserve account.

Class 3 consists of the secured property tax claims in the estimated amount of approximately $140,000. This class unanimously voted to accept the plan, as a result of the ballots cast by Maricopa County and Riverside County, California.

Class 4 consists of priority employee claims in the approximate amount of $12,000. All four ballots cast in this class voted to accept the plan.

Class 5 consists of priority unsecured tax claims that the Debtor estimates to be approximately $13,000. The Arizona Department of Revenue stipulated to withdraw its objection to the plan and to vote its Class 5 priority claim in the amount of $5,663 in favor of

the plan, as a result of which Class 5 unanimously accepted the plan.

Class 6 is the consignment claims that Debtor estimates to total approximately $196,000. The plan provides that the consignment agreements giving rise to these claims will be rejected, the Debtor will enter into new consignment agreements, and the creditors will be paid 90% of any monetary arrearage on the effective date. All four ballots cast in this class voted to accept the plan, in the approximate amount of $208,000.

Class 10 consists of the equity ownership of Owen and Linda Cowing. The plan provides that their equity ownership shall be extinguished and that on the effective date the Cowings shall contribute the $480,000 cash payable on their administrative claim in exchange for 100% of the equity of the reorganized debtor. In addition, there is an exit loan facility in the amount of $1.25 million to be funded by the Cowings. Together with cash on hand, this will be much more than sufficient to pay all administrative claims, including the Cowings', which will enable them to make their cash contribution to the Debtor, and also to fund a capital reserve.

The only rejections of the plan were cast by Comerica, both in Class 2 and Class 7.

The Court issued an opinion that the plan was confirmable, and should be confirmed,[8] and on May 24 entered a final order of confirmation. Comerica immediately appealed the confirmation order and filed the motion for stay pending appeal.

**The Legal Question of Denial of a Portion of Comerica's § 1111(b) Election**.

Comerica's principal argument, and the *only* significant "legal" question that it raises, is the denial of its § 1111(b) election[9] as to the portion of the collateral Comerica

---

[8] *In re Red Mountain Machinery Co.*, No. 2:09-bk-19166-RJH, 2011 WL 1428266 (Bankr. D. Ariz. April 14, 2011).

[9] 11 U.S.C. § 1111(b) provides:
(1)(A) A claim secured by a lien on property of the estate shall be allowed or disallowed under section 502 of this title the same as if the holder of such claim had recourse against the debtor on account of such claim, whether or not such holder has such recourse, unless –
    (i) the class of which such claim is a part elects, by at least two-thirds in amount and more than half in number of allowed claims of such class, application of paragraph (2) of this subsection; or
    (ii) such holder does not have such recourse and such property is sold under section 363 of this title or is to be sold under the plan.

purchased by a credit bid at a § 363 sale. That objection raised essentially two legal questions: (1) does the sale exception to the election apply when the sale occurred prior to the election and prior to confirmation, and (2) how does the sale exception apply when only some, but not all, of the collateral is sold?

Although it is true there is no case law addressing either of these questions, there are two strong reasons why they do not raise serious legal questions. First, the language of the sale exception is clear that it applies either to a future sale under the plan or to any sale under § 363.[10] The language "to be sold under the plan" clearly refers to an event to occur in the future. Indeed, because Bankruptcy Rule 3014 requires the § 1111(b) election to be made at the conclusion of the hearing on the disclosure statement for a plan, the confirmation hearing on such a plan is usually the very next event to occur in the bankruptcy case. By contrast, therefore, the language "is sold under § 363" is not similarly limited to a sale in the future. "Is sold" must refer to any sale that occurs during the pendency of the case. Had the drafters intended to refer only to a future sale they would have used a construction parallel to their reference to sales under a plan, such as "is to be sold under § 363." And the drafters of such language certainly could not be interpreted as referring only to the extremely rare if not unheard of event of a sale occurring simultaneously with the making of the election, which as noted occurs at the conclusion of a disclosure hearing rather than at a sale hearing.

More importantly, however, is the purpose of the § 1111(b) election. It is universally recognized that the purpose of the § 1111(b) election is to allow the secured creditor

---

(B) A class of claims may not elect application of paragraph (2) of this subsection if –
    (i) the interest on account of such claim of the holders of such claims in such property is of inconsequential value; or
    (ii) the holder of a claim of such class has recourse against the debtor on account of such claim and such property is sold under section 363 of this title or is to be sold under the plan.
(2) If such an election is made, then notwithstanding section 506(a) of this title, such claim is a secured claim to the extent that such claim is allowed.

[10] Bankruptcy Code § 363(b) authorizes a Chapter 11 debtor in possession to sell property other than in the ordinary course of business, after notice and a hearing. Code § 363(k) provides that at any sale under § 363(b), a creditor secured by a lien on the property being sold may purchase the property by a credit bid, unless the court for cause orders otherwise.

to protect its interest in collateral that might appreciate in value or be worth more than the court determined when a debtor's plan permits a "cash out" at a depressed value. That is what occurred in *Pine Gate*,[11] which Congress sought to rectify by adopting § 1111(b).[12] Thus the purpose of the election is to give the lien holder the same ability to realize on the future appreciation of its collateral as it would have if it could make a credit bid for the collateral at a public sale:

> If the property is valued by the bankruptcy court and effectively "sold" to the debtor outright at the valuation price, the worth of the undersecured lien is reduced to the current market value of the property, and, unlike the situation where he can be a successful bidder, the lien holder is unable to benefit from any unanticipated post-valuation appreciation.[13]

As noted, this is universally recognized to be the sole purpose of § 1111(b): "In § 1111(b), Congress sought to give creditors the opportunity to capture future appreciation in the value of their collateral."[14] "The creditor thus retains a right to enjoy future appreciation in the collateral or to compensate for an initially low appraisal."[15]

Obviously, this purpose to protect an undersecured creditor's interest in future

---

[11] *In re Pine Gate Assocs., Ltd.*, 2 Bankr. Ct. Dec. (LRP) 1478 (Bankr. N.D. Ga. 1976).

[12] "Congress did perceive the result in *Pine Gate* to be unfair, and did enact § 1111(b) to remedy that unfairness." Ronald Barliant, *Bad Medicine: Cram Down, § 1111(B)(2) Elections and Federal Regulations,* 2008 NORTON BANKRUPTCY LAW ADVISER No. 7 (July 2008). *Accord*, 5 NORTON BANKR. LAW AND PRACTICE 3D § 102:3, at 102-9 to -10 (2011); *Tampa Bay Assocs., Ltd. v. DRW Worthington, Ltd. (In re Tampa Bay Assocs., Ltd.)*, 864 F.2d 47, 49 (5th Cir. 1989) (Section 1111(b) was "enacted by Congress to cure the harsh result of" *Pine Gate*); *See also*, *In re SubMicron Systems Corp.,* 432 F.3d 448, 460 n.15 (3d Cir. 2006) (quoting *Tampa Bay*).

[13] *680 Fifth Ave. Assocs. v. Mut. Benefit Life Ins. Co. (In re 680 Fifth Ave. Assocs.)*, 29 F.3d 95, 97 (2nd Cir. 1994) (citing 5 L. King, COLLIER ON BANKRUPTCY ¶ 1111.02[2], at 1111-22 (15th ed. 1993)). *Accord,* 5 NORTON BANKRUPTCY LAW AND PRACTICE 3D, § 102:2 at 102-7 ("The § 1111(b)(2) election gives the secured creditor, whose collateral the debtor has determined to retain, the ability both: (a) to avoid an unfavorable hypothetical valuation of the collateral under Code § 506(a), which value is speculative since the property will not have been exposed to the market, and (b) to seek to capture any future appreciation of the property securing creditor's claim.").

[14] *Tuma v. Firstmark Leasing Corp. (In re Tuma)*, 916 F.2d 488, 491 (9th Cir. 1990) (citing 124 CONG. REC. 32392, 32408 (Sept. 28, 1978) (Statement of Rep. Edwards)).

[15] Theodore Eisenberg, *The Undersecured Creditor in Reorganizations and the Nature of Security*, 38 Vand. L. Rev. 931, 939 (1985).

appreciation of the collateral is unnecessary where the creditor has already purchased the collateral by a credit bid.[16] That is precisely what happened here. The Debtor noticed a § 363 sale for approximately half of Comerica's collateral, and Comerica made a credit bid and purchased that equipment. As the current owner of that equipment, Comerica already has the ability to enjoy any future appreciation in its value, and is not subject to any risk of an artificially low valuation by the bankruptcy court. Therefore with respect to the collateral that Comerica has purchased, the § 1111(b) election could not serve any purpose for which it was intended. That remains just as true regardless of whether the sale is held before or after the deadline for the creditor to make the election.

Consequently the Court must conclude that there really is no "serious legal question" arising from the denial of the § 1111(b) election as to the collateral that Comerica has already purchased. As to that collateral, Comerica's rights and interests are fully protected by allowance of its stipulated $9.8 million deficiency claim as an unsecured claim. And even allowance of that unsecured claim permits Comerica a double recovery to the extent the collateral that it purchased for its $7 million credit bid actually had more value than that or appreciates in value.

**No Likelihood of Irreparable Injury From Partial Denial of the § 1111(b) Election.**

But even if this were deemed a "serious legal question" on which Comerica might have some chance of success on appeal, there has been absolutely no showing of any likelihood of irreparable injury, nor could there be. The parties have stipulated that the value of Comerica's remaining collateral is approximately $10 million. And they have agreed that because Comerica was entitled to make, and did make, the § 1111(b) election as to the remaining collateral, its total lien against that collateral under the plan is $15.9 million, even

---

[16] "Because an undersecured . . . creditor is protected to the full extent of its claim by virtue of its ability to bid up to the full value of that claim under § 363(k), Congress concluded that § 1111(b)(1)(A) need not apply to § 363(k) sales." *SubMicron Systems,* 432 F.3d at 460 n.15.
"[If there is a sale of the collateral,] There is no need to give the recourse secured creditor the additional protection of the § 1111(b)(2) election, because the recourse creditor through the sale can obtain the full benefit of its bargain and will not be disadvantaged by an artificially low judicial valuation." 5 NORTON BANKRUPTCY LAW AND PRACTICE, § 102:9, at 102-26.

though it is only worth $10 million today.

Comerica has made no showing, nor could it really do so with a straight face, that it is likely to be irreparably injured because the remaining collateral could appreciate by more than 60% before its appeal is decided. Comerica cannot possibly be injured, as a practical matter, irreparably or otherwise, by the denial of a portion of its § 1111(b) election, when it already owns all of the collateral as to which that portion of the election was denied, and it made the election as to the remainder. Any argument that irreparable injury can arise from this Court's error in deciding this allegedly serious legal question is fanciful at best.

**Comerica's Other Objections Raise Factual Issues, Not Serious Legal Questions**

None of Comerica's other arguments for a likelihood of success on appeal raise any "legal questions" at all, much less "serious legal questions." Comerica's objections to feasibility,[17] adequacy of the new value contribution,[18] the appropriate interest rate,[19] classification,[20] the fair and equitable requirement[21] and the best interest test all raise only factual issues, not "serious legal questions." And the likelihood of Comerica convincing an appellate court that this Court made "clear error" in those factual findings is certainly not great. Most importantly, Comerica's chances of success on appeal of these factual findings must be

---

[17] "[F]airness, and feasibility [of a chapter 11 plan of reorganization] present questions of fact which we review under the clearly erroneous standard." *Acequia, Inc. v. Clinton (In re Acequia, Inc.)*, 787 F.2d 1352, 1358 (9th Cir. 1986).

[18] "[W]hether a particular plan gives old equity a property interest 'on account of' its old ownership interests in violation of the absolute priority rule or for another, permissible reason is a factual question." *Bonner Mall P'ship v. U.S. Bancorp Mortgage Co. (In re Bonner Mall P'ship)*, 2 F.3d 899, 911 (9th Cir. 1993), *appeal dismissed as moot*, 513 U.S. 18 (1994).

[19] "A bankruptcy court should be accorded substantial deference in making cramdown interest rate determinations." *Farm Credit Bank of Spokane v. Fowler (In re Fowler)*, 903 F.2d 694, 696 (9th Cir. 1990).

[20] "[A] bankruptcy court's finding that a claim is or is not substantially similar to other claims [for purposes of classification in a chapter 11 plan], constitutes a finding of fact reviewable under the clearly erroneous standard." *Steelcase Inc. v. Johnston (In re Johnston)*, 21 F.3d 323, 327 (9th Cir. 1994).

[21] "[F]airness, and feasibility [of a chapter 11 plan of reorganization] present questions of fact which we review under the clearly erroneous standard." *Acequia*, 787 F.2d at 1358.

1  deemed slim because it presented no evidence on any of them.

2  As noted in the confirmation order, Comerica's expert presented no evidence that
3  the plan was not feasible.[22] Indeed, to the contrary, Comerica's expert admitted the plan was
4  feasible if Comerica could meet its projections, admitted that Comerica had exceeded its
5  projections in most of the recent months, and admitted that the assumptions underlying the
6  projections were reasonable.

7  Comerica's expert provided no testimony, analysis or report on the adequacy[23] of
8  the Cowings' $480,000 (or $1.2 million) new value contribution.

9  Comerica presented no evidence on how the plan might not be fair and equitable as
10 to Comerica (other than the increased interest on its remaining debt), or how the plan failed to
11 provide Comerica at least as much as it would recover in a Chapter 7 liquidation. Indeed,
12 Comerica could hardly present any such evidence given its stipulation as to the value of its
13 collateral, while the plan promises to pay it precisely that much, plus more on its unsecured
14 claim that would yield nothing in a Chapter 7 liquidation, while retaining Comerica's lien in an
15 amount far in excess of that liquidation value.

16 Comerica presented no evidence, objection or legal argument how the
17 classification of Comerica's deficiency claim in Class 7, instead of with other unsecured claims
18 in Class 8, would make any difference much less how it caused any harm to Comerica, since
19 Class 7 and Class 8 receive the identical treatment under the plan. At oral argument on its

---

[22] Although the Code does not use the terms "feasible" or "feasibility," the feasibility requirement is Code § 1129(a)(11), which requires a showing that "confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor . . . ." It does not require a guarantee of success, but merely a "reasonable probability of success." *Acequia*, 787 F.2d at 1364; *In re Patrician St. Joseph Partners Ltd. P'ship*, 169 B.R. 669, 674 (D. Ariz. 1994).

[23] To satisfy the "new value corollary" to the absolute priority rule, and to satisfy § 1129(b)(2)(B)(ii) notwithstanding the objection by an unsecured class that is not paid in full, former equity owners are "required to offer value that was 1) new, 2) substantial, 3) money or money's worth, 4) necessary for a successful reorganization and 5) reasonably equivalent to the value or interest received." *Bonner Mall, supra* note 19, at 908, citing *Case v. Los Angeles Lumber*, 308 U.S. 106, 121-22 (1939). The "adequacy" of the new value contribution refers to both elements 2 and 5. Comerica presented no factual evidence or expert opinion on any of the five elements, and at closing argument Comerica's counsel admitted that elements 1 and 3 were satisfied.

motion for stay pending appeal Comerica's counsel argued that if the claims had been classified in the same class that class would have rejected the plan, and that therefore there would have been no accepting impaired class to satisfy the confirmation requirement of § 1129(a)(10). But in objecting to confirmation Comerica did not object that § 1129(a)(10) was not satisfied, did not object to the plan's designation of accepting Classes 3, 4, 5, 6 as impaired classes, and did not object to the Debtor's ballot report identifying each of them as accepting classes.[24] Nor did the parties' joint pretrial statement identify satisfaction of § 1129(a)(10), or the impairment or acceptance by Classes 3, 4, 5 and 6, as either a factual issue or a legal issue for the evidentiary confirmation hearing.[25] Comerica has not preserved for appeal any argument that if its deficiency claim were classified in Class 8, confirmation of the plan had to be denied due to a failure to satisfy § 1129(a)(10). Consequently even if there is a technical legal question as to the propriety of the classification, it makes no practical difference and is therefore harmless error that cannot possibly raise either a serious legal question or a basis for any irreparable injury to Comerica.

And on the one factual issue as to which Comerica did submit expert opinion evidence – the appropriate interest rate to provide a present value of Comerica's secured debt – Comerica's expert provided no testimony as to the factors, and the only factors, that the Supreme Court has held to be relevant.[26] The most that Comerica can do now is to cite a bankruptcy court opinion from Pennsylvania suggesting that the Supreme Court's holding "is instructive, but it is not controlling . . . in every Chapter 11 case."[27] That hardly demonstrates a strong likelihood of success on appeal.

---

[24] *See* Comerica's Objection to Confirmation of Debtor's First Amended Plan of Reorganization (Dec. 29, 2010, docket # 424).

[25] *See* Joint Pre-Trial Statement Relating to Final Hearing on Plan Confirmation (April 1, 2011, docket # 568).

[26] *See Till v. SCS Credit Corp.*, 541 U.S. 465 (2004).

[27] Comerica's Emergency Motion for Stay Pending Appeal at 11, ¶ 25 (quoting *In re Prussia Assocs.*, 322 B.R. 572, 585 (Bankr. E.D. Pa. 2005)).

**Comerica Has Demonstrated No Likelihood of Irreparable Injury**

More significantly, however, Comerica has failed to demonstrate any likelihood of irreparable injury, or that the balance of hardships tips in its favor. Even if Comerica were to prevail on appeal, it is difficult to see how it could have been injured by the absence of a stay in the meantime.

Even without a stay, Comerica remains secured by a lien on all of the Debtor's equipment, and its debt remains guaranteed by the Cowings, who Comerica admits are solvent. Comerica has made no showing, either at the lift stay hearing, the confirmation hearing, or in its motion for stay pending appeal, that the value of that collateral is likely to decline while the appeal is pending. Indeed, to the contrary, Comerica's complaint about the denial of a portion of its § 1111(b) election is premised on the belief that the value of the collateral will *appreciate*, not depreciate. Debtor has pointed out that the value of the collateral pool stipulated to by the parties at the outset of the case was less than $14 million. Yet by the time of confirmation and after selling $7 million of the equipment, Comerica stipulated that the remaining collateral was worth $10 million. So in the approximate one year between the sale and the confirmation hearing, the remaining collateral appreciated from $7 million to $10 million. That increase in the value of Comerica's collateral more than compensates for any decrease in the value of Comerica's cash collateral, and in any event Debtor has demonstrated that the cash collateral is preserved under the plan because the payments required to be made on the effective date are derived from the exit financing provided by the Cowings, not from Comerica's cash collateral.

Even if there were a diminution of the cash that serves as Comerica's collateral there has been no showing, or even argument, that such a diminution is either injurious to Comerica or irreparably so. That would require a showing of a likelihood of default while Comerica's collateral pool is diminished. But since Comerica presented no evidence of a lack of feasibility, it has made no showing of such a likelihood of default before its appeal is heard. And the evident appreciation in the value of the equipment collateral likely more than offsets any diminishment of the cash position. The Cowings' cash infusion of $1.25 million similarly minimizes the likelihood of default while the appeal is pending. In short, there has been no

13

showing of irreparable injury even if Comerica can demonstrate that its cash collateral will be diminished.

And unlike many Chapter 11 plans, confirmation of this plan does not "strip" Comerica's lien. Because it took advantage of the § 1111(b) election with respect to all of the collateral that the Debtor retains, Comerica's lien remains fully intact – it has not been stripped down in amount as Code § 506(a)(1) ordinarily permits. Confirmation of the plan therefore has no effect on the amount of Comerica's lien, so there can be no irreparable injury on that basis.

Nor can there be any irreparable injury arising from modification of Comerica's debt. Under the plan, Comerica's secured debt will be fully repaid with interest at 6.5%, which is an *increase* from its current contract rate of approximately 4.25%. Comerica can hardly complain it is being injured by this increase in the interest rate on its debt. And even if an appellate court should conclude that the increase should be even greater to provide present value in light of the current market and the relevant risks, such a modification on appeal would not prevent confirmation of the plan. This is because Comerica's own expert testified that the plan was feasible even if the interest rate were as much as 10.7%, higher than the highest rate that Comerica even argued for.

There can be no injury from any error in approving the classification of unsecured claims. The treatment of claims in Class 7 and Class 8 is identical. The confirmation requirement of § 1129(a)(10) would still be satisfied if Comerica's deficiency claim were classified in Class 8 resulting in rejection of the plan by that Class, because the acceptances by Classes 3, 4, 5 and 6 would each satisfy the requirement for at least one accepting impaired class. And the rejection by Class 8 would make no difference in requiring confirmation to be by "cram down" under § 1129(b), because that was already required as a result of the rejection by Class 7, the Comerica deficiency claim.

Comerica cannot be injured by any inadequacy of the "new value" being contributed by the equity holders. There is no evidence anyone would have contributed any more, the Debtor actively solicited third party investors, and exclusivity had been terminated for more than a year for anyone to propose a better plan. The new value that is being contributed

14

provides the source of payment on unsecured debt, including Comerica's deficiency claim, which would receive nothing on liquidation. And, as noted, at the confirmation hearing Comerica failed to submit *any* evidence that the new value contribution was insufficient, which belies any attempt to argue now that Comerica is being irreparably injured by any theoretical deficiency that might be argued on appeal.

Indeed, the only attempt that Comerica makes to argue that it will be irreparably injured – only one paragraph in a 19 page motion[28] – is to suggest that its appeal "***may*** become moot absent a stay" (emphasis added). But "It is well settled that an appeal being rendered moot does not itself constitute irreparable harm."[29] The law is clear in the Ninth Circuit that "irreparable injury cannot be shown solely from the possibility that an appeal may be moot."[30]

**Conclusion**

While it is questionable whether Comerica has raised *any* "serious legal questions," it has certainly not made a "strong showing" of likelihood of success on appeal. But even if there were a sufficient showing of likelihood of success on appeal, it does not justify a stay pending appeal in the absence of any showing of a likelihood of irreparable injury. It is a "bedrock requirement that stays must be denied to all petitioners who did not meet the applicable irreparable harm threshold, regardless of their showing on the other stay factors."[31]

Comerica has not shown any likelihood of irreparable injury in the absence of a stay, nor has it shown that the balance of hardships tips sharply in Comerica's favor. Because Comerica has not made a strong showing of likelihood of success on appeal, and more importantly because Comerica has failed to demonstrate any likelihood of irreparable injury, its motion for stay pending appeal is denied.

Comerica alternatively seeks "a brief administrative stay so that Comerica may

---

[28] In excess of the 15 pages permitted by Local Bankruptcy Rule 9013-1(b).

[29] *Ohanian v. Irwin (In re Irwin)*, 338 B.R. 839, 853 (E.D. Cal. 2006).

[30] *Acton v. Fullmer (In re Fullmer)*, 323 B.R. 287, 304 (Bankr. D. Nev. 2005).

[31] *Leiva-Perez*, 2011 WL 124334, at *2.

1 petition the District Court for a stay pending appeal." Comerica provides no authority for a
2 Bankruptcy Court to grant "a brief administrative stay" if it is something other than a stay
3 pending appeal pursuant to Bankruptcy Rule 8005. Nor has Comerica identified the showing
4 that must be made for the issuance of such an "administrative" stay. The Ninth Circuit's
5 "bedrock requirement that stays must be denied to all petitioners who did not meet the
6 applicable irreparable harm threshold" would seem to apply as well to a petitioner for a "brief
7 administrative stay." Because Comerica has not satisfied that threshold requirement for any
8 stay, the "brief administrative stay" must be denied as well.

DATED AND SIGNED ABOVE